UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| WENDY BALSER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.  08-11376-LTS |
| ) | |
| IUE LOCAL 201 and GENERAL ) | |
| ELECTRIC CO., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

ORDER AND MEMORANDUM ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT.

October 4, 2010

SOROKIN, M.J.

Pending are the Motions for Summary Judgment of the Defendants, General Electric

Company (GE) (Docket # 23) and the International Union of Electronic, Electrical, Salaried,

Machine & Furniture Workers (the Union)(Docket # 29).  For the following reasons, the Motions

are ALLOWED.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Balser is an employee of GE and a member of the Union.  Docket # 25 at ¶¶ 2-3.  She has

brought suit against the Defendants alleging both that GE removed her from her position in

violation of the applicable Collective Bargaining Agreement (CBA) and that the Union breached

1

its duty to her of fair representation when it instigated her removal and declined to take the matter to arbitration.  Docket # 1.

GE Aircraft Engines, a division of GE, manufactures jet engines for both commercial and military use.  Docket # 25 at ¶ 1.  One if its manufacturing facilities (River Works) is located in Lynn, Massachusetts, and Balser has been employed at River Works since July, 2007.  Id. at ¶¶ 1-2.  Initially, Balser was employed as a Zyglo Inspector, a position in which she was responsible for the nondestructive testing of parts used in the construction of aircraft engines.  Id. at ¶ 2.  The Union is the exclusive bargaining representative for members employed at River Works.  Id. at ¶ 3.  Balser's employment at River Works is governed by a CBA between GE and the Union, comprised of three agreements:  (1)  the 2007-2011 National Agreement between General Electric and IUE-CWA, the Industrial Division of the Communications Workers of America, AFL-CIO, CLC and its affiliated locals, including the local Union defendant (the National Agreement); (2) the 1974 Local Understanding Upgrading and Job Posting Agreement; and, (3) the Layoff and Transfer Supplement contained in the 1977 Supplemental Agreement. Id. at ¶ 4.

Whenever a GE manager needs additional employees in his or her area of responsibility (either because of extra need, or to replace an employee who is retiring or on leave), he or she completes a 'Request for Help.'  It is common practice at River Works for GE's managers to anticipate vacancies and to fill them in advance.   Docket # 27 at ¶ 16; Docket # 28 at ¶ 5.  On January 28, 2008, two Requests for Help were completed, each seeking a Zyglo Sorter.  Docket # 25 at ¶6.  As with Zyglo Inspectors, the Zyglo Sorter position also involves the nondestructive testing of parts used in the construction of aircraft engines.  Id. At ¶ 8.  The Zyglo Sorter position, however, is paid on a piecework basis, as opposed to an hourly wage.  Id.  As a result,

2

Zyglo Sorters potentially earn much more money than many other River Works GE, as much as $200,000 per year according to Balser's counsel.  GE's counsel represents that a result of this earning potential, all of the Zyglo Sorter positions are held by persons with at least 30-35 years of seniority.  Balser had just seven months of seniority.  Docket # 32 at ¶ 15.  As a result of the January 28, 2008, Requests for Help, two Zyglo Sorter positions were posted by GE on February 12, 2008.  Docket # 25, at ¶ 12.

On or about February 11, 2008, Balser learned that she was being laid off from the Zyglo Inspector position due to lack of work.  Id. at ¶ 13.  Balser's layoff from the Zyglo Inspector position was governed by the Layoff and Transfer Supplement component of the CBA, thus giving her priority over other more senior employees for open positions for which she was qualified.  Id. at ¶¶ 14, 19.   Rick Sampson was at that time the GE employee responsible for job postings at River Works.  Docket #35 at ¶ 1.  On February 13, 2008, Balser met with Sampson to discuss positions that might be available to her after her layoff.  Id. at ¶ 2.  Sampson told Balser of the available Zyglo Sorter position and that although it was usually given to very high seniority employees, Balser was nevertheless eligible because she was experiencing a lack of work layoff and she had the necessary Zyglo training and certifications.  Id.; Docket #25 at ¶¶ 17-19.  At this time, Sampson believed the position was permanent and told Balser that it was permanent.  Docket # 35 at ¶ 3; Docket #25 at ¶ 20.  Balser was referred for a further interview with Thomas Towey, the Zyglo Sorter Manager.  Docket #35 at ¶¶ 7-8. On February, 14, 2008, Towey offered Balser the position and she accepted, and was scheduled to begin work on February 19, 2008.  Id. at ¶¶ 7, 43.

Between the February 14, 2008, offer to Balser and her reporting to work, there were

discussions between GE and the Union, and Balser and Union members, in which Union officials

and members expressed their displeasure at the prospect of Balser being placed in the Zyglo

Sorter position permanently, given her mere seven months of seniority.  See, e.g., Docket #35 at

¶¶ 13, 17-21.  Matthew Scagnelli, a Human Resources Manager at GE, affirms that after Balser

had accepted the Zyglo Sorter position, GE reassessed its needs and determined that it did not

need two new permanent Zyglo Sorters, and that it therefore reclassified the position Balser had

accepted as temporary. Docket # 28 at ¶¶ 6-8.  Scagnelli further affirms that GE reclassified the

position from permanent to temporary  "before Ms. Balser punched in to the Zyglo Sorter

position (i.e., before she began physically performing PW Zyglo Sorter job duties), which

occurred on February 20, 2008."  Id. at ¶ 9.  No record evidence directly disputes this assertion.

Several related undisputed facts support Scagnelli's undisputed sworn affirmation:  Sampson has

testified that he was notified by Scagnelli that the job had been changed from a permanent to a

temporary position two or three days after his (Sampson's) February 13, 2008, meeting with

Balser.  Docket # 26-3 at 8.  Similarly, a February 19, 2008, email from Ric Casilli, the Union's

business agent, to a member of the Union's Executive Board Member indicates that GE told

Casilli on that date (a day prior to Balser's punching in) that Balser was in the Zyglo Sorter

position as "an illness temporary."  Docket # 35, Ex. J.

      Balser did not report to work on February 19th, saying that she felt sick to her stomach

because she feared for her safety.  Id. at ¶ 10.  Balser discussed her concerns with Sampson on

February 19th, but the Parties dispute the content of that conversation and in particular whether

or not Sampson informed Balser that the position had been reclassified by GE as temporary.  See,

infra, at 9 ff.  Sampson testified that he explained the reclassification to Balser and told her that

she could refuse the job without penalty because it was temporary, but that Balser stated she still wished to take the position.  Docket 26-3 at 8.   He testified that Balser knew when she began working that the position was temporary.  Id. at 13.

Balser disputes Sampson's version of their conversation.  She now asserts that Sampson gave her the choice of taking the job as a permanent position (with the prospect of facing the wrath of the union) or of consenting to take the position as a temporary position.  Docket # 35 at ¶ 24.  There are serious questions concerning Balser's credibility in advancing her present version of that conversation.  For example, Balser submitted a grievance form dated April 2, 2008, which was prepared by a Union official, Gary Poland, based upon information which Balser provided to him. Docket # 26-1 at 20-21; Docket #32-12 at 6.  Balser reviewed the form prior to its submission.  Id. at 2; Docket #32-12 at 6.  In that form, she recited that on February 19, 2008, the day before she actually reported for work, Sampson notified her "that the job was no longer permanent and that it was temporary." Docket # 26-1 at 21.  Balser testified at her deposition that the statement quoted was incorrect.  When asked why she submitted a grievance with incorrect information contained in it, she answered that she didn't know.  Id.  Nonetheless, I accept Balser's present version of her conversation with Sampson.  However, the material fact is whether GE reclassified prior to February 20, i.e., what Scagnelli did, not whether Balser consented to the reclassification and not what Balser and Sampson discussed.

Balser reported to work on February 20.  Ultimately, Balser was removed from the Zyglo Sorter position and was placed in a different position when the temporary Zyglo Sorter position expired.

II.     DISCUSSION

Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law." Rogan v. City of Boston, 267 F.3d 24, 26 (1st Cir.2001)(citing Fed. R. Civ. P. 56(c)).
Once a party has properly supported its motion for summary judgment, the burden shifts to the
non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set
forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research
Corp., 63 F.3d 32, 37 (1st Cir.1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256
(1986).  Moreover, the Court  is "obliged to view the record in the light most favorable to the
nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."
LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993).  Even so, the Court is to
ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v.
City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).

Standard of Review for Hybrid Claims

Hybrid claims pursuant to Section 301 of the Labor Management Relations Act, 29
U.S.C., § 185, are those which involve alleged wrongdoing on the part of both the employer and
the union with respect to the rights of an employee.  See Fant v. New England Power Serv., 292
F.3d 8, 14 (1st Cir.2001).  "Such a suit, as a formal matter, comprises two causes of action."
DelCostello v. International Broth. of Teamsters, 462 U.S. 151, 164 (1983). "Yet the two claims
are inextricably interdependent.  To prevail against either the company or the Union

6

 . . . [plaintiffs] must not only show that [the adverse employment action] was contrary to the

contract but must also carry the burden of demonstrating a breach of duty by the Union." Id. at

164-65 (quoting United Parcel Service, Inc. v. Mitchell, 451 U.S. 56, 66-67 (1981)).   In other

words,  in order to recover against either GE or the Union, Balser must prove both that GE

violated the collective bargaining agreement and that the Union breached its duty of fair

representation.  Chaparro-Febus v. International Longshoremen Ass'n, Local 1575, 983 F.2d 325,

330 (1st Cir.1992).

As "the exclusive bargaining representative of the employees, [a][u]nion [has] a statutory

duty fairly to represent all of those employees both in its collective bargaining . . .  and in its

enforcement of the resulting collective bargaining agreement." United Steelworkers of Am., v.

Rawson, 495 U.S. 362, 372 (1990) (quoting Vaca v. Sipes, 386 U.S. 171 (1967)). This is the

"duty of fair representation.'"  Emmanuel v. International Brotherhood of Teamsters, 426 F.3d

416, 420 (1st Cir.2005) (quoting BIW Deceived v. Local S6, Indus. Union of Marine &

Shipbuilding Workers of Am., 132 F.3d 824, 830 (1st Cir.1997)). "A union breaches this duty by

acting discriminatorily, in bad faith, or arbitrarily toward a union member." Id. (citing

Morales-Vallellanes v. Potter, 339 F.3d 9, 16 (1st Cir.2003)).

A union acts arbitrarily "if, in light of the factual and legal landscape at the time of the

union's actions, the union's behavior is so far outside a wide range of reasonableness as to be

irrational." Emmanuel, 426 F.3d at 420 (quoting Miller v. United States Postal Service, 985 F.2d

9, 11-12 (1st Cir.1993)). This standard accords the Union "substantial deference" and "ample

latitude to perform their representative functions." Id. In addition, "a union's mere negligence or

erroneous judgment will not constitute a breach of the duty of fair representation." Miller, 985

F.2d at 12. As one judge of this Court explained "a union's failure to take a grievance to arbitration is a breach only when it is truly arbitrary or irrational." <u>Newbanks v. Central Gulf Lines</u>, 64 F .Supp.2d 1, 5 (D.Mass.1999) (Harrington, J.).

The action against GE is based upon an alleged violation of a contract, the CBA.  Thus, in opposing summary judgment, Balser's burden is to demonstrate a genuine dispute of material fact concerning whether GE's reclassification of the Zyglo Sorter position from permanent to temporary constituted a breach of the CBA.  The Union asserts that it did not pursue Balser's grievance because she had no contractual rights under the CBA to vindicate.  Thus, the threshold inquiry in evaluating both of the Defendants' motions, then, is whether or not Balser can demonstrate a genuine dispute of material fact concerning a breach of the CBA.

<u>Whether GE's Reclassification Violated the CBA</u>

The Union and GE each assert that Balser cannot prevail on either component of her hybrid claim because she cannot establish that she had a right to the Zyglo Sorter position under the CBA.

Balser alleges that her removal from the Zyglo Sorter (and, in particular, its re-classification as a temporary position) violated the CBA.  Docket # 1, at ¶¶ 19, 21 ("Balser was removed from the Zyglo Sorter job and moved to a different position, supposedly due to lack of work and because the job was only a temporary for Ms. Balser, despite the fact that there was no lack of work, the company had over-hired, and despite the fact that the job had been a permanent position when it was posted, when she applied for it, and when she worked in it.  The removal of Ms. Balser from this job was a violation of the [CBA]  .  .  .  under the [CBA] Balser had filled the position as a permanent position and  .  .  .  she could not be removed from the position").

8

Matthew Scagnelli, a Human Resources Manager at GE, affirms that after Balser had accepted the Zyglo Sorter position, it reassessed its needs and determined that it did not need two new permanent Zyglo Sorters, and that it therefore reclassified the position Balser had accepted as temporary. Docket # 28 at ¶¶ 6-8.  Scagnelli further affirms that GE reclassified the position from permanent to temporary  "before Ms. Balser punched in to the Zyglo Sorter position (i.e., before she began physically performing PW Zyglo Sorter job duties), which occurred on February 20, 2008."  Id. at ¶ 9.  GE concedes that had it determined that there was insufficient work to support the number of Zyglo Sorters only after Balser had punched in, then it would have been required to conduct layoffs by seniority in accordance with the Layoff and Transfer Supplement component of the CBA.  Id. at ¶ 14: Docket # 27 at ¶ 10.

In order to overcome the summary judgment motions of the Defendants, then, Balser must demonstrate a genuine dispute of material fact as to whether the position was reclassified before, or after, she punched in.[1]

The Timing of the Reclassification

The evidentiary record concerning the timing of the reclassification supports Scagnelli's affirmation that it occurred prior to Balser beginning work on February 20, 2008.  Sampson has testified that he was notified by Scagnelli, two or three days after his February 13, 2008, meeting

---

[1]  Balser might also have succeeded by establishing that a reclassification before she punched in was itself violative of the CBA.  However, she conceded at her deposition that she knew of nothing in the CBA that would prevent the company from reclassifying her position before she punched in. See Docket # 26-1 at 24; Docket # 26-2 at 11. In her papers she has not disavowed that position nor has she asserted that the reclassification was motivated by an illegal purpose such as racial or gender discrimination.  At oral argument, plaintiffs' counsel contended that Balser vested in the position once she accepted the position orally on February 14.  No evidence supports the assertion that rights under the CBA vest at that point – rather, the evidence establishes otherwise.  Docket #27 at ¶¶ 10-11.

with Balser, that the job had been changed from a permanent to a temporary position.  Docket #
26-3 at 8.  In addition, a Union official sent an email on February 19 referring to the
reclassification by GE.  And, there is no evidence disputing Scagnelli's affidavit testifying that
reclassification occurred prior to Balser reporting to work on February 20, 2010.

Balser devotes much of her argument to attempting to demonstrate that GE's purported
reasons for its reclassification are pretextual, masking its true motive to appease the Union's
objection to Balser being hired on a permanent basis when she lacked the years of seniority that
others in the position had invested in work with the union.  See, e.g., Docket #35 at ¶¶ 22, 28;
Docket #33, at 10-11.  However, even if the Court credits Balser's representations regarding GE's
motives for re-classifying the position, pretext[2] is not itself demonstrative of a violation of the
CBA.  Likewise, resolution of the propriety of GE's actions under the CBA is not informed by
evidence concerning Balser's subjective belief as to whether or not the position was classified as
temporary or permanent.  See Docket # 33 at 11 ("Ms. Balser chose to keep the position as
permanent and go to work and feel unsafe and hope that nothing happened. As Ms. Balser
testified, 'I went in there terrified and took it as a permanent.' Ms. Balser never agreed to take the
job on a temporary basis").  The question presented by the Defendants' motions is not whether
Balser agreed to accept the position as temporary, but rather whether GE reclassified the position
as temporary (with, or without, her acquiescence) prior to her punching in.

---

[2]  The Court notes Balser is asserting that it was pretext for favoring more senior
employees and not a pretext for racial, gender or other prohibited discrimination.

GE asserts that is has the unlimited right under the CBA to determine appropriate staffing levels for positions at River Works.  Docket # 27 at ¶ 9; Docket # 28 at ¶ 12.  It points to Paragraph (b) of Article XXIX of the National Agreement, which provides:

> Subject only to any limitations stated in this Agreement, or any other agreement between the Company and the Union or a Local, the Union and the Locals recognize that the Company retains the exclusive right to manage its business, including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to direct the work force, and to conduct its operations in a safe and effective manner.

Docket # 27-3 at 7.

Scagnelli and Justin Warsinskey (GE's Union Relations Manager) each affirm that, "[t]here is no provision in the CBA that limits or restricts GE's right to determine the appropriate number of employees in any position, including the PW Zyglo Sorter position, at any time." Docket # 27 at ¶ 8; Docket # 28 at ¶ 12.  Scagnelli further affirms that, "[a]ccordingly, if GE acquires information that indicates that a position originally posted as permanent might result in increased headcount unsupported by the available work -- as we did in the case of Request No. 11983A -- GE can either cancel the position altogether or change the position from permanent to temporary, provided that it does so before an employee selected for the opening punches in." Docket # 28 at ¶13.

Casilli affirms that in the Union's view, GE does not violate the CBA by cancelling previously posted positions, since the CBA gives GE the right to determine the number of employees in any position.  Docket # 32-1 at ¶¶ 16, 20.

Balser has adduced no evidence that GE's or the Union's interpretation of the CBA is incorrect.  Balser asserts that the reclassification of the position, at least if performed at the behest

11

of the union, violated her contractual rights given her layoff status.  However, Balser has no rights that limit the exclusive right of GE to manage its business.  A superior right to claim open positions does not limit GE's right to change or eliminate open positions before a union member vests in the position nor is such a right the same as a contractual right to obtain the one job in the plant that pays double what other positions pay.[3]

<u>CONCLUSION</u>

Because Balser cannot demonstrate that GE's actions in reclassifying her position violated the CBA, she cannot prevail on her hybrid claim, and the Motions for Summary Judgment of the Defendants (Docket #s 23 and 29) are ALLOWED.  Judgment shall enter in favor of defendants.

SO ORDERED.

_____/s / Leo T. Sorokin_____
UNITED STATES MAGISTRATE JUDGE

---

[3] In light of the foregoing, the Court finds that the Parties' disagreement over whether or not GE's decision to reclassify was based upon changing information it received from the Union (and whether or not that information was accurate) is not material to the resolution of the pending motions.